Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/23/2018 12:11 AM CST

State of Nebraska, appellee, v.
Ryan M. Barbeau, appellant.
___ N.W.2d ___

Filed October 12, 2018.    No. S-17-1158.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Investigative Stops: Appeal and Error.** The ultimate determinations of reasonable suspicion to conduct an investigatory stop are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge.

3. **Constitutional Law: Search and Seizure.** Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures.

4. **Constitutional Law: Search and Seizure: Investigative Stops: Motor Vehicles.** A traffic stop is a seizure for Fourth Amendment purposes, and therefore is accorded Fourth Amendment protections.

5. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs: Probable Cause.** As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. A traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle.

6. **Constitutional Law: Investigative Stops: Motor Vehicles: Police Officers and Sheriffs: Probable Cause.** Probable cause is not the only standard applied by courts to determine whether a traffic stop is reasonable under the Fourth Amendment. The Fourth Amendment also permits brief investigative stops of vehicles based on reasonable suspicion when

a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity.

7. **Probable Cause.** Like the probable cause standard, the reasonable suspicion standard takes into account the totality of the circumstances.

8. **Constitutional Law: Investigative Stops: Police Officers and Sheriffs: Probable Cause.** Police can constitutionally stop and briefly detain a person for investigative purposes if the police have a reasonable suspicion, supported by articulable facts, that criminal activity exists, even if probable cause is lacking under the Fourth Amendment.

9. **Probable Cause: Words and Phrases.** Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized suspicion or hunch, but less than the level of suspicion required for probable cause.

10. **Judgments: Records: Appeal and Error.** Where the record adequately demonstrates that the decision of a trial court is correct—although such correctness is based on a ground or reason different from that assigned by the trial court—an appellate court will affirm.

11. **Constitutional Law: Investigative Stops: Motor Vehicles: Police Officers and Sheriffs: Statutes.** Reasonable suspicion, as a prerequisite for a constitutional investigatory stop, cannot be based only on a police officer's desire to verify compliance with motor vehicle registration statutes.

12. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs: Statutes.** When an officer observes a vehicle without license plates or in-transit tags, a particularized and objective basis exists to justify a reasonable, articulable suspicion that the driver may be criminally avoiding the motor vehicle registration statutes. The State's interest in enforcing its registration laws supports a brief investigatory stop to ascertain whether the driver possesses the necessary documentation to show compliance with the motor vehicle registration statutes.

13. **Probable Cause: Police Officers and Sheriffs.** Reasonable suspicion can be premised on an officer's mistake of fact or mistake of law, so long as the mistake was reasonable.

14. ____: ____. A determination that reasonable suspicion exists need not rule out the possibility of innocent conduct. The inquiry is not whether some circumstances may be susceptible of innocent explanation, but whether, taken together, they suffice to form a particularized and objective basis for the officer to suspect a crime is, or is about to, occur.

15. **Police Officers and Sheriffs: Motor Vehicles: Probable Cause.** Exiting a highway after passing a sign indicating there is a police checkpoint ahead does not, without more, give rise to reasonable suspicion. But it is one factor which can be considered in the totality of the circumstances.

16. **Investigative Stops: Motor Vehicles: Time.** A lawful traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of the stop.

17. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs.** Once a vehicle is lawfully stopped, a law enforcement officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop. This investigation may include asking the driver for an operator's license and registration, requesting that the driver sit in the patrol car, and asking the driver about the purpose and destination of his or her travel. Also, the officer may run a computer check to determine whether the vehicle involved in the stop has been stolen and whether there are any outstanding warrants for any of its occupants.

Appeal from the District Court for Hamilton County: RACHEL A. DAUGHERTY, Judge. Affirmed.

Mark Porto, of Porto Law Office, for appellant.

Douglas J. Peterson, Attorney General, and Joe Meyer for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

STACY, J.

Ryan M. Barbeau appeals his convictions for drug-related felonies, arguing the evidence was obtained as the result of an unconstitutional traffic stop and should have been suppressed. The district court overruled his motion to suppress, finding the traffic stop was supported by probable cause. We do not reach the question of probable cause, because we conclude this was an investigatory traffic stop supported by reasonable suspicion. Therefore, although our reasoning differs from that of the district court, we agree the motion to suppress was properly overruled, and we therefore affirm.

## BACKGROUND

On December 11, 2015, Nebraska State Patrol Trooper Gregory Goltz was conducting a "ruse checkpoint" operation

at the Giltner interchange on Interstate 80 in Hamilton County, Nebraska. As part of that operation, signs were placed along the Interstate advising drivers there was a State Patrol checkpoint ahead and a drug dog in use. No such Interstate checkpoint actually existed, but troopers monitored vehicles that left the Interstate immediately after passing the sign.

At approximately 2:52 p.m., Goltz saw a Lincoln Town Car leave the Interstate after passing the checkpoint sign. The car stopped at the end of the off ramp, signaled, and turned north onto the Giltner spur. Goltz followed the car, eventually catching up to it and traveling several car lengths behind it. The car was not speeding.

Goltz could see the car had no license plates, but had what appeared to be an in-transit tag mounted inside a black license plate holder on the rear of the car. Portions of the in-transit tag were covered by the top and bottom of the frame, preventing Goltz from reading the state of issuance and some of the numbers and handwriting on the tag. Goltz also noticed some of the handwritten numbers on the in-transit tag were written in red ink; he considered that unusual because he had never seen a Nebraska in-transit tag with red ink before. Goltz initiated a traffic stop.

After the car was stopped, Goltz approached it on foot and was able to read "North Carolina" on the in-transit tag. There were two individuals in the car. Goltz made contact with the driver and explained he had been stopped because his car did not have plates and the trooper could not read the in-transit tag. Goltz asked to see an operator's license and identified the driver as Barbeau.

Goltz asked to see the car's paperwork to determine whether the in-transit tag was "real." Barbeau told Goltz he had recently purchased the car in North Carolina and was driving it back to his home in Oregon. But Barbeau was not able to produce any paperwork or insurance information on the car.

When Barbeau was unable to produce any paperwork for the car, Goltz had him step out of the car and walk to the

front of Goltz' patrol car. Goltz' plan was to "investigate the vehicle" and obtain additional information from Barbeau about "where the vehicle came from" and Barbeau's travel plans. Goltz then got into his patrol car to run Barbeau's operator's license and wait for backup. Goltz had called for backup, and a canine unit, almost immediately after the stop. According to Goltz, he planned to return to Barbeau's car to take a closer look at the in-transit tag once backup arrived.

Within a few minutes of the initial stop, another trooper arrived on the scene and obtained the passenger's identification information. When Goltz ran the passenger's information, he learned there was an active warrant for his arrest. The passenger was then arrested and handcuffed.

After the passenger was arrested, the dog alerted to drugs in the trunk of Barbeau's car. A subsequent search of the car yielded an AR-15 semiautomatic rifle with ammunition and a 30-round clip; two marijuana pipes; 40 tramadol pills; 60 hydrocodone pills; and $39,575, which was determined to have been used in a controlled substance transaction.

Barbeau was then arrested and charged with (1) possession of a controlled substance with intent to deliver while in possession of a firearm, (2) possession of a deadly weapon during the commission of a felony, (3) possession of drug money, and (4) possession of a controlled substance. Goltz did not issue Barbeau a ticket or a warning related to the in-transit tag.

Before trial, Barbeau moved to suppress the evidence obtained from the search of his car. Barbeau argued Goltz did not have probable cause or reasonable suspicion to initiate the traffic stop. Alternatively, he argued the stop should have been terminated as soon as Goltz could read the information on the in-transit tag.

The State countered that Goltz had probable cause for the traffic stop based on the partially obscured in-transit tag. The State claimed this was a violation of Neb. Rev. Stat. § 60-399(2) (Reissue 2010), which requires that "[a]ll letters,

numbers, printing, writing, and other identification marks" on plates "shall be kept clear . . . so that they shall be plainly visible at all times during daylight and under artificial light in the nighttime."

At the evidentiary hearing on the motion to suppress, Goltz testified to the facts summarized above and a video recording of the stop was received into evidence. The court found that some of the information on the in-transit tag was covered by the license plate frame, and because the printing was not "plainly visible," the court concluded that Goltz had probable cause to suspect a violation of § 60-399(2). The court rejected Barbeau's claim that the traffic stop should have ended once Goltz approached the car and could read the in-transit tag was from North Carolina. The court reasoned that once the car was lawfully stopped, Nebraska law permitted Goltz to conduct an investigation reasonably related in scope to the circumstance that justified the traffic stop, including asking the driver for an operator's license and registration, requesting the driver to sit in the patrol car, asking the driver about the purpose and destination of his or her travel, and running a computer check to determine whether the vehicle involved in the stop had been stolen and whether there were outstanding warrants for any of its occupants.[1] The trial court reasoned that while troopers were conducting such an investigation, they discovered the passenger had an active warrant. They then arrested the passenger and conducted a postarrest search, during which the drugs, gun, and money were discovered. The trial court overruled the motion to suppress.

The State and Barbeau subsequently entered into an agreement whereby the State would drop the charge of possession of a deadly weapon during the commission of a felony in exchange for a bench trial on stipulated facts. At the bench trial, Barbeau renewed his motion to suppress evidence obtained from the stop.

---

[1] See *State v. Nelson*, 282 Neb. 767, 807 N.W.2d 769 (2011).

The trial court found Barbeau guilty of possession of a controlled substance with intent to deliver, possession of drug money, and possession of a controlled substance. Barbeau was sentenced to concurrent terms of imprisonment, the longest of which was 18 to 36 months. He timely appealed, and we moved the case to our docket on our own motion.[2]

## ASSIGNMENTS OF ERROR

Barbeau assigns, restated, that the district court erred in (1) denying his motion to suppress and (2) finding him guilty based on evidence that should have been suppressed.

## STANDARD OF REVIEW

[1] When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[3] Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[4]

[2] The ultimate determinations of reasonable suspicion to conduct an investigatory stop are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge.[5]

## ANALYSIS

Barbeau contends the traffic stop in this case violated the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution, both of which protect individuals against unreasonable searches and seizures by the government. He argues the traffic stop was not supported by either probable

---

[2] See Neb. Rev. Stat. § 24-1106(3) (Supp. 2017).

[3] *State v. Thalken*, 299 Neb. 857, 911 N.W.2d 562 (2018).

[4] *Id.*

[5] *State v. Woldt*, 293 Neb. 265, 876 N.W.2d 891 (2016).

cause or reasonable suspicion, and he also challenges the duration of the investigation, arguing that once Goltz approached the car and was able to read the in-transit tag, no further investigation was justified.

Because Barbeau's motion to suppress focused only on the lawfulness and duration of the traffic stop, and did not challenge whether the search of his car was supported by probable cause, we confine our analysis accordingly. We begin by setting out the constitutional principles governing traffic stops.

## Traffic Stops Must Be Supported by Either Probable Cause or Reasonable Suspicion

[3,4] The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ," as does article I, § 7, of the Nebraska Constitution. A traffic stop is a seizure for Fourth Amendment purposes, and therefore is accorded Fourth Amendment protections.[6]

[5] As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.[7] We have long recognized that a traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle.[8]

[6,7] But probable cause is not the only standard applied by courts to determine whether a traffic stop is reasonable under the Fourth Amendment. The U.S. Supreme Court has

---

[6] *Heien v. North Carolina*, ___ U.S. ___, 135 S. Ct. 530, 190 L. Ed. 2d 475 (2014). See *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[7] *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996).

[8] See, e.g., *Thalken, supra* note 3; *State v. Hill*, 298 Neb. 675, 905 N.W.2d 668 (2018); *State v. Jasa*, 297 Neb. 822, 901 N.W.2d 315 (2017); *State v. Au*, 285 Neb. 797, 829 N.W.2d 695 (2013).

recognized the Fourth Amendment permits brief investigative stops of vehicles based on reasonable suspicion when a law enforcement officer has a "'particularized and objective basis for suspecting the particular person stopped of criminal activity.'"[9] The reasonable suspicion needed to justify an investigatory traffic stop "'is dependent upon both the content of information possessed by police and its degree of reliability.'"[10] Like the probable cause standard, the reasonable suspicion standard "takes into account 'the totality of the circumstances—the whole picture.'"[11] A mere hunch does not create reasonable suspicion, but the level of suspicion required to meet the standard is "'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause."[12]

[8,9] Nebraska courts have also applied the reasonable suspicion standard when considering the lawfulness of a traffic stop.[13] In doing so, this court has recognized that "'[p]olice can constitutionally stop and briefly detain a person for investigative purposes if the police have a reasonable suspicion, supported by articulable facts, that criminal activity exists, even if probable cause is lacking under the [F]ourth [A]mendment.'"[14]

---

[9] *Navarette v. California*, 572 U.S. 393, 396, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014), quoting *United States v. Cortez*, 449 U.S. 411, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981). See, also, *Terry, supra* note 6.

[10] *Navarette, supra* note 9, 572 U.S. at 397, quoting *Alabama v. White*, 496 U.S. 325, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990).

[11] *Id.*, quoting *Cortez, supra* note 9.

[12] *Id.*, quoting *United States v. Sokolow*, 490 U.S. 1, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989).

[13] See, e.g., *Jasa, supra* note 8; *State v. Arizola*, 295 Neb. 477, 890 N.W.2d 770 (2017); *State v. Rodriguez*, 288 Neb. 878, 852 N.W.2d 705 (2014); *State v. Bol*, 288 Neb. 144, 846 N.W.2d 241 (2014); *Au, supra* note 8; *State v. Lamb*, 280 Neb. 738, 789 N.W.2d 918 (2010); *State v. Wollam*, 280 Neb. 43, 783 N.W.2d 612 (2010).

[14] *State v. Childs*, 242 Neb. 426, 433, 495 N.W.2d 475, 479 (1993), quoting *State v. Staten*, 238 Neb. 13, 469 N.W.2d 112 (1991).

We have explained that "'[r]easonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.'"[15] When determining whether there is reasonable suspicion for a police officer to make an investigatory stop, the totality of the circumstances must be taken into account.[16]

### Traffic Stop Was Supported by Reasonable Suspicion

[10] Before analyzing whether there was reasonable suspicion to support this traffic stop, we pause briefly to address Barbeau's arguments focused on the district court's finding of probable cause. The district court found the initial traffic stop was supported by probable cause to believe a violation of § 60-399(2) had occurred, because some of the printing on the in-transit tag was not "plainly visible." Barbeau argues, on appeal, that he was not a resident of Nebraska and thus was only required to comply with the registration requirements of Neb. Rev. Stat. § 60-367 (Cum. Supp. 2016). Section 60-367 provides that nonresident vehicles must comply with the registration requirements of the owner's state of residence and "conspicuously" display registration numbers as required thereby. Barbeau argues that because he was not required to comply with the "plainly visible" requirement of § 60-399(2), there could be no probable cause to suspect a violation of that statute. Because we find the stop was investigatory in nature and was supported by reasonable suspicion, we do not address the district court's probable cause finding, and we express no opinion on whether the "plainly visible" requirement of § 60-399(2) applies to nonresidents. Where the record adequately demonstrates that the decision of a trial court is correct—although such correctness is based on a ground or reason

---

[15] *Id*. at 433, 495 N.W.2d at 479-80.

[16] *Rodriguez, supra* note 13.

different from that assigned by the trial court—an appellate court will affirm.[17]

When considering whether there was reasonable suspicion to support the traffic stop in this case, our prior decisions in *State v. Childs*[18] and *State v. Bowers*[19] are instructive. Both cases involved investigatory traffic stops based on suspected vehicle registration violations.

[11] In *Childs*, police observed a car driving with in-transit tags and stopped the car to check whether the tags were still within the valid timeframe for use. On those facts, we concluded there was no reasonable suspicion for the stop, and we rejected the State's contention that whenever police see a vehicle operating on the street with an in-transit tag, they should suspect a violation of the motor vehicle registration laws. We found it significant that before stopping the vehicle, police noticed "nothing suspicious or out of the ordinary" about the operation of the vehicle, the appearance of the vehicle, or the appearance of the in-transit tag.[20] We held that "[r]easonable suspicion, as a prerequisite for a constitutional investigatory stop, cannot be based only on a police officer's desire to verify compliance with motor vehicle registration statutes."[21] Because police had no articulable facts upon which to suspect the driver "had been engaged in, was presently engaged in, or was about to engage in any criminal activity,"[22] we found the traffic stop was unconstitutional.

[12] Three years after *Childs*, we decided *Bowers*. In that case, we found police had reasonable suspicion to conduct an investigatory traffic stop of a car being operated without

---

[17] *Jasa, supra* note 8.

[18] *Childs, supra* note 14.

[19] *State v. Bowers*, 250 Neb. 151, 548 N.W.2d 725 (1996).

[20] *Childs, supra* note 14, 242 Neb. at 427, 495 N.W.2d at 477.

[21] *Id*. at 433, 495 N.W.2d at 480.

[22] *Id.* at 435, 495 N.W.2d at 481.

license plates or in-transit tags. The driver in *Bowers* argued the absence of plates or in-transit tags did not provide reasonable suspicion to believe he was operating the car unlawfully. He reasoned that under Neb. Rev. Stat. § 60-320.01 (Reissue 1993), he could lawfully operate the car without plates or an in-transit tag for 30 days after purchase from a nonlicensed seller, provided he could produce the proper documentation of ownership upon demand. We agreed that the driver was in "full compliance with the motor vehicle licensing laws," but we observed that "[s]ome people who operate motor vehicles without license plates or in-transit tags clearly do so in an unlawful attempt to escape the requirements of the motor vehicle registration statutes."[23] We reasoned:

When an officer observes a vehicle without license plates or in-transit tags, a particularized and objective basis exists to justify a reasonable, articulable suspicion that the driver may be criminally avoiding the motor vehicle registration statutes. The State's interest in enforcing its registration laws supports a brief investigatory stop to ascertain whether the driver possesses the necessary documentation to establish that he or she is within the 30-day grace period to register the vehicle.[24]

The Nebraska Court of Appeals applied similar reasoning in *State v. Kling*[25] and found police had reasonable suspicion to conduct an investigatory stop of a vehicle displaying handwritten in-transit tags. The driver in *Kling* argued that handwritten in-transit tags did not violate state law, and he relied on *Childs* for the proposition that an officer's desire to merely verify compliance with registration laws does not, without more, amount to reasonable suspicion. The State countered that handwritten in-transit tags should have the

---

[23] *Bowers, supra* note 19, 250 Neb. at 159, 548 N.W.2d at 730.

[24] *Id.* at 161, 548 N.W.2d at 731.

[25] *State v. Kling*, 8 Neb. App. 631, 599 N.W.2d 240 (1999).

same legal effect as no in-transit tags, and thus relied on *Bowers* for the proposition that when a car is being operated without displaying plates or in-transit tags, police have a particularized and objective basis to suspect the vehicle registration laws are being violated.

The Court of Appeals reviewed our holdings in *Childs* and *Bowers* and concluded the facts presented in *Kling* were more akin to *Bowers*. That court observed that although Nebraska law did not prohibit handwritten in-transit tags, neither did it authorize them. Thus, the court held that when police saw the car being operated without plates or dealer-issued in-transit tags, that observation provided reasonable suspicion the driver was violating the motor vehicle registration laws and justified the investigatory stop.

[13,14] These cases illustrate that the determination of reasonable suspicion is fact specific and requires police to have a particularized and objective basis for suspecting a driver is violating the vehicle registration law. *Childs* teaches that an officer's desire to verify whether an in-transit tag is valid will not, without more, be sufficient to provide reasonable suspicion the vehicle is being operated in violation of the vehicle registration laws. But *Bowers* and *Kling* illustrate that when police have reliable information that provides a particularized and objective basis for suspecting the vehicle is being operated in violation of the vehicle registration laws, there is reasonable suspicion to conduct an investigatory traffic stop. This is so even if the reasonable suspicion is premised on an officer's mistake of fact or mistake of law, so long as the mistake was reasonable.[26] Moreover, a determination that reasonable suspicion exists need not rule out the possibility of innocent conduct.[27] The inquiry is not whether some circumstances may be susceptible of innocent explanation, but whether, taken

---

[26] *Heien, supra* note 6.

[27] *United States v. Arvizu*, 534 U.S. 266, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002).

together, they suffice to form a particularized and objective basis for the officer to suspect a crime is occurring, or is about to occur.[28]

The question of reasonable suspicion in this case, then, turns on whether, considering the totality of the circumstances, Goltz had reliable information that provided a particularized and objective basis for suspecting Barbeau was operating his car in violation of the motor vehicle registration laws.

Barbeau does not challenge the district court's factual findings concerning Goltz' information and observations, and we find no clear error in those findings. Applying the constitutional principles discussed above to those factual findings, we conclude Goltz had an objective basis, based on firsthand observation, for reasonably suspecting Barbeau was operating his car in violation of the registration laws.

First, as in *Bowers*, there were objective signs of possible noncompliance with Nebraska's registration laws. Under Nebraska law, a dealer-issued in-transit "sticker shall [have] plainly printed in black letters the words In Transit" and must be displayed either on the front and rear windows or on the rear side windows of the vehicle.[29] The in-transit tag on Barbeau's car was located on the rear bumper and included red handwriting. Goltz had never seen a Nebraska in-transit tag with red handwriting. Moreover, the tag was affixed inside a license plate frame that partially obstructed the information on the top and bottom of the tag, preventing Goltz from being able to read the state of issuance.

Unlike the police in *Childs*, Goltz did not initiate a traffic stop merely to check the validity of the tags without any reasonable suspicion they were noncompliant. Nor does the record support the conclusion that Goltz initiated the traffic stop based on nothing more than his inability to read the in-transit tag

---

[28] See *id.*

[29] See Neb. Rev. Stat. § 60-376 (Cum. Supp. 2016).

while pursuing the car.[30] Rather, in addition to the inability of Goltz to read some of the information on the tag, the tag itself appeared suspect due to its location on the car, the red ink, and the fact that some information was covered by the license plate frame.

[15] Moreover, when considering the totality of the circumstances, we also consider that Goltz had seen Barbeau exit the Interstate immediately after passing a sign advising drivers there was a State Patrol checkpoint ahead. Exiting a highway after passing a sign indicating there is a police checkpoint ahead does not, without more, give rise to reasonable suspicion.[31] It is, however, "one factor which can be considered in the totality of the circumstances."[32] And here, Goltz' knowledge that Barbeau pulled off the Interstate immediately after passing a sign notifying drivers of an upcoming State Patrol checkpoint, when combined with the irregular appearance of the temporary tag and the fact that some information on the tag was covered by the frame, creates a particularized and objectively reasonable suspicion that the vehicle is not in compliance with the registration laws and that the driver wants to evade detection.

We therefore determine the investigatory stop of Barbeau's car was supported by reasonable suspicion and comported with the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution.

### INVESTIGATION

Barbeau contends that even if the initial stop was lawful, Goltz should have ended the stop as soon as he approached

---

[30] Compare *U.S. v. McLemore*, 887 F.3d 861 (8th Cir. 2018) (officer's inability to read temporary registration card in vehicle's rear window while following in police cruiser does not, without more, give rise to reasonable suspicion vehicle is being operated in violation of registration laws).

[31] See *U.S. v. Yousif*, 308 F.3d 820 (8th Cir. 2002). See, also, *State v. Hedgcock*, 277 Neb. 805, 765 N.W.2d 469 (2009).

[32] *Hedgcock, supra* note 31, 277 Neb. at 816-17, 765 N.W.2d at 480.

the car and was able to see the in-transit tag was from North Carolina. According to Barbeau, any continued investigation beyond that point was unreasonable, and thus unlawful.

[16] In *Rodriguez v. U.S.*,[33] the U.S. Supreme Court cautioned that a lawful traffic stop "'"can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission'"' of the stop. When the mission of an investigative stop is addressing a suspected traffic violation, the stop may "'"last no longer than is necessary to effectuate th[at] purpose'"' and authority for the seizure "thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."[34] However, the U.S. Supreme Court has recognized that beyond just determining whether to issue a traffic citation or warning, an officer's mission in a traffic stop "includes 'ordinary inquiries incident to [the traffic] stop.'"[35] Typically, "such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."[36]

[17] Similarly, this court has long held that once a vehicle is lawfully stopped, a law enforcement officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop.[37] This investigation may include asking the driver for an operator's license and registration, requesting that the driver sit in the patrol car, and asking the driver about the purpose and destination of his or her travel.[38] Also, the officer may run a computer check to determine whether the vehicle involved in the stop has been

---

[33] *Rodriguez v. U.S.*, ___ U.S. ___, 135 S. Ct. 1609, 1614-15, 191 L. Ed. 2d 492 (2015).

[34] *Id.*, 135 S. Ct. at 1614.

[35] *Id.*, 135 S. Ct. at 1615.

[36] *Id.*

[37] *Nelson, supra* note 1.

[38] *Id.*

stolen and whether there are any outstanding warrants for any of its occupants.[39]

Having concluded the investigatory stop of Barbeau's car was lawful, we agree with the trial court that Goltz was justified in conducting an investigation related to the circumstances that justified the stop and gave rise to Goltz' reasonable suspicion that the car was being operated in violation of the motor vehicle registration laws. The record shows that after initiating the stop, Goltz approached the car, briefly inspected the in-transit tag, and then proceeded to contact the driver and ask many of the routine questions that this court, and the U.S. Supreme Court, have recognized as appropriate incidental to a traffic stop.

On appeal, Barbeau does not claim the scope of Goltz' investigation was too broad under the circumstances, nor does he argue the few minutes it took for backup and the canine unit to arrive unnecessarily extended the stop. Instead, he argues the entire investigation should have ended before Goltz made contact with the driver.

Barbeau's argument in this regard is premised on the flawed assumption that the only justification for the stop was Goltz' inability to read the state of issuance on the in-transit tag. Summarized, Barbeau argues that he was stopped because Goltz could not see the state of issuance on the in-transit tag, so he argues that once Goltz approached the car and was able to read "North Carolina," the purpose of the traffic stop was accomplished and no further investigation was warranted.

But as discussed above, the circumstances justifying the investigatory stop here included more than just Goltz' inability to read the state of issuance on the in-transit tag. In addition to being unable to read some of the information on the tag, the tag itself appeared suspect due to its location, the red ink, and the fact that it was partially covered by the license plate frame. The additional fact that Barbeau was seen exiting the

---

[39] *Id.*

Interstate immediately after passing a sign notifying drivers of an upcoming State Patrol checkpoint, combined with the irregular appearance of the temporary tag, gave Goltz a particularized and objectively reasonable suspicion that the car was not in compliance with the registration laws and that the driver wanted to evade detection. Having lawfully stopped the car, Goltz was authorized to conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop,[40] and the record supports that he did just that.

There is no merit to Barbeau's claim that the investigatory stop should have ended before Goltz contacted the driver to begin his investigation.

## CONCLUSION

For the reasons discussed above, the district court did not err in overruling the motion to suppress. Barbeau's assignments of error have no merit, and we therefore affirm the judgment of the district court.

AFFIRMED.

---

[40] See *id.*